KEEBEY v. STIFFT.

Opinion delivered July 5, 1920.

1. MALICIOUS PROSECUTION—ELEMENTS.—To justify an action for malicious prosecution, both want of probable cause and malice must be shown.

2. MALICIOUS PROSECUTION—PROBABLE CAUSE DEFINED.—A probable cause is such a state of facts known to the prosecutor, or such information received by him from sources entitled to credit, as

would induce a man of ordinary caution or prudence to believe, and did induce the prosecutor to believe, that the accused was guilty of the crime alleged, and thereby cause the prosecution.

3. MALICIOUS PROSECUTION—QUESTION FOR JURY.—Where the facts relied upon to constitute probable cause are undisputed, the question is one of law for the court to determine, and should not be submitted to the jury.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk*, Judge; affirmed.

*Emerson, Donham & Shepherd*, for appellant.

The court erred in directing a verdict for defendants, as there was ample evidence to sustain a verdict for appellant. A case for a jury was made of malicious prosecution. No probable cause was shown and defendants acted maliciously, as plaintiff had been tried and duly acquitted.

*Moore, Smith, Moore & Trieber*, for appellees.

1. Stifft acted with probable cause in causing appellant's premises to be searched, and the question of malice is immaterial. 71 Ark. 360; 24 How. 544. The directed verdict for defendants was proper. 111 Ark. 309; 104 *Id.* 268. All the facts pointed to Keeby's guilty knowledge. There was no dispute as to the facts known to Stifft and the information received by him, and it was a question for the court to determine as to whether there was probable cause. 124 Ark. 34. There was nothing to submit to a jury. Stifft had no connection with the prosecution before the municipal court except to report the information he had received and to appear as a witness at the trial. 100 Am. St. Rep. 319; 71 Ark. 351.

2. As to probable cause, see 71 Ark. 358. The testimony of Bernhardt settles the question, and the court properly directed an acquittal for defendants.

WOOD, J. For several years P. G. Keebey had been engaged in the jewelry business in Little Rock, Arkansas, where he had been a resident all of his life. Chas. S. Stifft was engaged in the jewelry business in Little Rock

and Sidney H. Florsheim, a son-in-law of Stifft, was employed by Stifft in his jewelry store.

On September 26, 1916, the deputy district attorney filed an information before the municipal court of Little Rock charging Keebey with the crime of receiving stolen property of the value of more than $10, knowing that the same had been recently stolen, and caused a warrant of arrest of Keebey to be issued thereon. Stifft, on the next day, filed an affidavit that certain property which had been stolen from his store was in the possession of Keebey in his store, and had a warrant issued for searching Keebey's store. Keebey was arrested and taken to police headquarters, and while there Stifft's private detective asked him a number of questions about some 18-carat rings, and he told the detective that he knew nothing about them. The detective said, "You are a damn liar," and turned around and said to the officers, "Lock the son-of-a-bitch up," whereupon he, Keebey, was taken to the jail and locked up. He was confined to the jail about three and one-half hours before he had a chance to give bond. Stifft and his son, and a dectective employed by Stifft, were present when a search was made and did practically all the searching. Stifft seemed angry while making the search. Keebey's store was located on the first floor of the Boyle building, facing Fifth street, one of the most public places in Little Rock. There were quite a number of people looking in while the search was going on. They searched the entire store. The officers making the search took only such articles as Stifft gave them. They took rings and other jewelry. Keebey was not present while the search was being made, but his wife and clerks were there. Stifft told some of Keebey's clerks that the jewelry was stolen, because Keebey was getting it too cheap. Most of the jewelry was taken from Keebey's show cases. Among other things they took some gold bullion in nugget form weighing 8 to 12 ounces which was worth between $75 and $80, and was made from accumulations of the filings from the benches in the shop, representing an accumulation of possibly 18 months. Stifft said that this

was his gold. They also took from the show cases some new ring mountings and some battered jewelry. They found some jewelry in Keebey's safe, which Stifft identified as his property. Stifft remarked during the search, "I notice that the largest part of Keebey's stock is made up of goods from my store." His manner was "pretty rough" during the entire search.

The principal part of Keebey's stock was bought from wholesale houses through traveling salesmen. Keebey purchased all of the jewelry, that was taken from his store by Stifft and the officers, openly and publicly over the counter. It was the custom among jewelers to buy up old gold such as was sold to Keebey by Bernhardt. Keebey could not tell from whom he purchased the ring mountings, but he bought some of the jewelry and ring mountings from Alec Bernhardt. He bought from him ten or fifteen times. He paid for the things he bought from him by check on the Exchange National Bank. In one instance he paid him $9. Paid $27.50 for the ring mountings, which was about $6 less than the market value. Keebey had bought old gold and jewelry also from a man by the name of Choate, who as a side line bought up old rings and jewelry of all kinds, also new jewelry. The buying and selling of old gold and jewelry was a business like buying other junk, such as iron and rubbish. Keebey had known Bernhardt eleven years, and had never had occasion at any time to suspect him of having stolen, or being connected with the stealing of, jewelry or anything else. He had been intimately associated with him, both being on the drill team of the Knights of Pythias. When Bernhardt brought the mountings to Keebey, the latter offered him 70 cents. He first refused to take it, demanding 85 cents, but afterward accepted the price Keebey offered. Sometimes Keebey would weigh up articles offered him by Bernhardt and make him a price which sometimes Bernhardt would refuse to take and other times he would accept.

Bernhardt had worked for Pfeifers', for Blass, and also had had charge of a men's furnishing store. After-

ward he was a traveling stationery salesman for a firm in St. Louis. At one time he represented one of the printing companies.

Keebey thought that Bernhardt was engaged in buying up old gold and reselling it as a side line, just as Mr. Choate was doing who worked for the Joppa Mattress Factory. Keebey never asked Choate where he got his old gold, neither did he ask Bernhardt, except on one occasion he asked Bernhardt where he got the ring mountings. Bernhardt said that he got them down in Texas. Keebey did not think it odd for Bernhardt to buy up those mountings, as he knew lots of men that handle the best lines. Keebey knew Isenstadt & Company, wholesale jewelers of St. Louis. He knew their trade mark, which was a square with a small 'E' in it. They also put the number of the carat inside the ring. Keebey exhibited a white top ring mounting stamped 14-k, which was taken from his stock of goods and which is similar to the white top mountings claimed by Stifft which Keebey purchased from Bernhardt. When he bought the rings from Bernhardt, he did not make any particular examination of the brand on them.

Sidney Mayer for eleven years had been working for Stifft in his jewelry store and at the time Keebey was arrested made a confession in the presence of Stifft, Florsheim, and Stifft's private detective. He stated that he had taken the jewelry from Stifft's store. Stifft asked him whether Keebey knew that the goods came from Stifft's establishment, and Mayer answered that so far as he knew Keebey knew nothing about it. Mayer had never told Keebey that the jewelry he was getting from Bernhardt had been stolen. Stifft seemed to believe that Keebey had known about it and was trying to make Mayer admit that he knew that Keebey knew about it. Mayer told Stifft that he did not see how Keebey could know that the goods were stolen because when he, Mayer, turned them over to Bernhardt he told Bernhardt that he got them from different parties mostly out of town. Stifft said that he thought Keebey

was the most guilty, and if Mayer would come clean and tell the truth he would try to be as lenient as he could with him. He said he was sure that Keebey knew about it. Stifft said that the man who received stolen property was worse than the man that took it. Mayer told him that if he had to go to the penitentiary for life and leave his wife and child that he couldn't change his statement because that was the truth. Mayer began stealing the jewelry from Stifft some time before he was arrested. He turned the jewelry over to Bernhardt to be sold. Bernhardt was to sell it, bring Mayer the money and Mayer was to pay Bernhardt all over a certain amount. Mayer told Bernhardt what he was to get for it. Bernhardt asked Mayer where he got the gold, and Mayer replied "from a negro." Mayer had no agreement with Bernhardt as to where he was to sell the old gold and did not know where he was selling it until after the first two or three sales. Mayer and Bernhardt had a system of signals. When Bernhardt would get an offer on the old gold he would call up Mayer and say that he had an offer on line 5 or line 10, which would mean $5 or $10. He would make these calls from some 'phone outside the place where he received the offer. The jewelry Mayer would have for sale would be new articles which he had taken from the stock of Stifft and hammered on and battered up and rubbed in so as to make it appear as old gold. He would do this in the mail order department. He would then take it and give it to Bernhardt that day or the next for sale. Bernhardt almost always disposed of it the same day that Mayer gave it to him. They would see each other that day or the next and make a division of the proceeds. Mayer would not want to guess at the quantity of jewelry he had stolen from Stifft in that manner. If in his written confession he stated that he had misappropriated $700 worth of merchandise the statement was correct. On two occasions he took ring mountings that were not mutilated and turned them over to Bernhardt for sale. Some of these were white top ring mountings which had not been long on the market.

Bernhardt sold them within a day or two. Mayer had taken the ring mountings with the word "Stifft" stamped inside but he removed the name by scratching it out with the end of a knife or sharp file. He would mash it after that so it would pass as old gold. The average amount that Bernhardt received for the different sales would run from $5 to $10. Mayer gave Bernhardt articles to sell twenty-five times. Mayer had known Keebey eleven years; Mayer was working for Stifft when Keebey also worked for him. Mayer was one of Stifft's trusted employees and had the combination to his safe. The firm of Isenstadt & Company, who sold Stifft the mountings that were stolen by Mayer, also sold the same kind of mountings to other houses in Little Rock.

One of Mayer's friends, Walter Brickhouse, was present and heard the conversation between Mayer, Stifft, and his detective, at the time Mayer made his confession. Brickhouse as Mayer's friend was trying to get him to make a statement that would cause Stifft to be lenient with Mayer. Brickhouse also knew Bernhardt and Keebey. They had all been on the drill team of the Knights of Pythias, and had been friends for about ten years. If Brickhouse had been in the business that Keebey was in and Bernhardt had offered him jewelry, he would have bought the same and would not have asked a question. After Mayer had made his confession Stifft said, "Well, this ............... we have got nothing here that will implicate Keebey," and Mayer said, "Well, I can not say anything against Keebey." He further stated that before he would implicate what he considered an innocent man he would go to the penitentiary.

Several prominent business men of Little Rock stated that they had known Bernhardt for many years, and that his reputation for honesty and fair dealing in the community was good prior to this trouble.

The trial before the examining court resulted in an acquittal of Keebey. After that Stifft had the matter presented to the grand jury. They returned seven indictments against Keebey. He was tried and acquitted

on one of these, and in the others a *nolle prosequi* was entered.

This action was brought by Keebey against Stifft and Florsheim to recover alleged damages in the sum of $100,000 for malicious prosecution. The above are substantially the facts developed by the testimony on behalf of Keebey.

Stifft and Florsheim answered the allegations of the complaint. Stifft admitted that a search warrant was issued at his instance to have Keebey's store searched for stolen property, but denied that this was done maliciously, or without probable cause, and denied that it was done with the intent to injure Keebey. He denied that he procured the information against Keebey charging him with a felony. He alleged that he made a full disclosure of all the facts within his knowledge to the prosecuting attorney, and upon those disclosures the prosecuting attorney lodged the information against Keebey charging him with the felony. He denied that in making the disclosures to the prosecuting attorney he acted maliciously or without probable cause.

The facts which the testimony on behalf of the defendants tended to prove are substantially as follows: Isenstadt & Company on August 9, 1916, sold 114 white gold top ring mountings to Stifft and on August 6, 1916, they sold thirteen such mountings to Storthz. They did not sell such mountings to any one else in Little Rock. Thirteen of these mountings introduced in evidence were manufactured by that company and were identified by its trademark. That company is the only house in the country that puts that mark in a Tiffany ring mounting. The wholesale jobbers' price on such mountings at that time was $1.05 per pennyweight. They could not be manufactured for 85 cents.

Bernhardt made a written confession in the presence of a stenographer, Brickhouse, Stifft, Florsheim, Perry Stifft, and Dr. Marshall. The confession was made about a week after Mayer had made his confession. The substance of the confession was that at different times dur-

ing 1915 and 1916 he and Mayer would have meeting places at different saloons where Mayer would turn over to him old gold which he sold to Keebey. He stated if there was any one in Keebey's store he would wait until they went out and then hand the gold to Keebey. If Keebey did not offer him the sum he wanted or that he thought Mayer would accept, he would go out and 'phone Mayer at Stifft's and say, he was offered so many lines which he would designate as dollars, and Mayer would say if you can not get any more accept so many lines for it. Bernhardt would then go back to Keebey who would pay him for it, and they would settle the transaction. If Keebey ever asked him where the gold came from, he would tell him from a negro. At one time he told him from a negro out of the State. He had been making these sales to Keebey about once a week for about forty different times.

During the confession, Stifft said, "If Mr. Keebey is guilty, if he has bought this stuff with knowledge, we want to get him."

The chief of police testified that on the evening of September 26, 1916, Stifft called him over the 'phone and informed him that he had a written confession from Mayer, one of his employees, and read to him the confession to the effect that he had stolen jewelry from Stifft's store and told how it had been disposed of. The officer then got in touch with the deputy prosecuting attorney and had him file an information against Keebey charging him with receiving stolen property and had Keebey arrested. The next morning witness heard Stifft's detective ask Keebey if he made inquiry of Berhardt as to where he got the stuff he was selling, and Keebey replied that Bernhardt told him he got it from some negro.

Hale testified that he was deputy prosecuting attorney, and to the best of his recollection at the request of the police department he filed an information before the municipal court charging Keebey with receiving stolen property. The police department gave him the details.

Neither Stifft nor Florsheim talked to witness except on the day of the trial in the municipal court.

Frank M. Jefferson testified that he had been in the jewelry business in Little Rock for twenty-four years, and that among reputable jewelers most of the old gold bought by them comes in shop trade. That is, customers would buy things and put in old gold as part payment, as a rule. At the request of Stifft witness had obtained from the municipal court the jewelry that was taken from Keebey's store and had kept same in his deposit box since that time. Most of it he treated as old gold. Some of the medals were not even engraved and had a new appearance. The white top ring mountings were new and have never been used.

Dr. Marshall testified that he was one of the witnesses to the confession made by Bernhardt in connection with the stealing of the jewelry from Stifft and selling of same to Keebey. He stated that Keebey did not know that the stuff he was selling was stolen. That he told Keebey he was getting it form a negro out of the State.

The detective testified, giving the details of the investigation leading to the arrest of Mayer, Bernhardt and Keebey. He had Mayer, who was suspected by Stifft, under surveillance for two days and saw him pass a package on the street to Bernhardt. He then called Mayer into Stifft's private office, informing him that he was a Pinkerton detective, and told him what he had seen. Mayer at first denied any knowledge whatsoever, but on further questioning confessed to the theft and to the disposition of the property as already detailed. Mayer made two confessions which witness dictated to the stenographer. Witness was at the police headquarters after Keebey was arrested and asked him, among other things, if he had suspected that the jewelry he was buying from Bernhardt as old gold was stolen property, and he stated that on one occasion he had and that he had asked Bernhardt where he was getting it and that Bernhardt replied that ''he was getting it from a negro.'' Witness admit-

ted that he told Keebey that he thought he was lying about the true facts.

It was shown that Bernhardt was out of the State, and his testimony taken at the circuit court on the trial of Keebey was introduced in evidence. The testimony goes into detail in showing the transaction between him and Mayer and Keebey. He stated, among other things, that all the transactions he had with Keebcy were open and above board. The sales were usually made over the counter, the customers and employees being present. He received an average of $10 per trip and made about forty trips. When Keebey asked him about it, he told him that he bought the jewelry in the regular way and that it came from parties who had title to it. Keebey would sometimes ask where the stuff came from and witness told him that it was coming from a negro out of the State. Keebey asked him if it was all right, and he told him that it was.

Stifft testified to circumstances that led him to suspect Mayer and Bernhardt and that led him to employ a detective to whom he stated the facts which he had observed. The detective began his investigation, and on the evening of the second day called Mayer into Stifft's office, and the confession was made as already detailed. After Mayer made his confession Stifft read same to the chief of police over the 'phone. Stifft told him that there were evidences of extensive conspiracies and asked him to attend to it at once. On the following morning Stifft made the affidavit for the search warrant of Keebey's store. He based his action on the confession of Mayer and his implications of Bernhardt and Keebey. It was necessary for him to go with the officers to make the search to identify the property. He did not take all the articles that he thought were his from Keebey's stock, but took enough to prove his case. He took the large nugget of gold because it was much larger than a small shop would be apt to have in its possession. His conclusion was that Keebey was receiving goods with his (Stifft's) trademark upon them, and that he would melt the same

to destroy their identification That was the natural course, according to reports published in jewelers' papers as to how stolen goods were treated. He identified the various articles as his property. Keebey was discharged before the municipal court, and Stifft caused the matter to be brought before the grand jury. At that time he had before him the confession of Bernhardt and Mayer which caused him to believe that Keebey was guilty of receiving stolen property. Among other things he stated. "The confession that Bernhardt was the go-between and that he had sold this stuff to Keebey caused me to conclude that Keebey was using it in the course of his business as a manufacturing jeweler, and I considered that the receiver of stolen property was worse than the thief." Stifft concluded that Mayer's confession showed that he had taken wedding rings from Stifft's stock and had tried to deface them and had sold them through Bernhardt to Keebey as old gold. He concluded that Keebey could not have avoided the knowledge that they were not old gold because the indentations were so deep that they could not be removed without filing away one-half the thickness of the ring, or by cutting a piece out. Besides it would still have the appearance of new gold. It had the appearance of new gold that had been tampered with. Besides he had before him the confession of Bernhardt that when Keebey asked him where he was getting the stuff he told him that he was getting it from a negro. "From that statement," says the witness, "only one deduction could appear in my mind, and that was that Keebey was buying old gold from Benhardt and was entirely shutting his eyes to the fact that it was being stolen." From all the circumstances, which the witness details, he said: "After the discharge of Keebey in the municipal court, I felt that I ought to continue the prosecution against him by placing the matter before the grand jury." Stifft denied that he made certain statements that were attributed to him by witnesses who heard Mayer's confession and while Keebey's store was being searched.

The testimony of Stifft was continued at great length, but the above presents its salient features.

At the conclusion of the testimony the court instructed the jury to return a verdict in favor of the defendants, which was done. Judgments were rendered in accordance therewith, from which is this appeal.

The ruling of the trial court was correct. "To justify an action for malicious prosecution both want of probable cause and malice must be shown." *Kable* v. *Carey,* 135 Ark. 137-42; *Chrisman* v. *Carney,* 33 Ark. 316-21; *Foster* v. *Pitts,* 63 Ark. 387-91; *Price* v. *Morris,* 122 Ark. 382.

If malice alone would justify the action, we would unhesitatingly hold that the facts above set forth were legally sufficient to send to the jury the issue as to whether or not there was malice on the part of Stifft. But as was held in *Lavender* v. *Hudgins,* 32 Ark. 764, "If a party prosecute another on a criminal charge he will be protected in so doing, however malicious his private motives may have been, provided that there was probable cause."

In *Hitson* v. *Simms,* 69 Ark. 439-41, the facts were somewhat similar, and in defining probable cause we said: "In cases like this, a probable cause is such a state of facts known to the prosecutor or such information received by him from sources entitled to credit as would induce a man of ordinary caution or prudence to believe, and to induce the prosecutor to believe, that the accused was guilty of the crime alleged and thereby cause the prosecution." See also *Whipple* v. *Gorsuch,* 82 Ark. 252.

In *Kansas & Texas Coal Co.* v. *Galloway,* 71 Ark. 351-57, this court defined probable cause in the language of Chief Justice Shaw in *Bacon* v. *Towne,* 4 Cushing, 58 Mass. 217, as follows: "Probable cause is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty."

In *St. L., I. M. & S. Ry. Co.* v. *Tyrus,* 96 Ark. 325, we held that: "One who sues for malicious prosecution must establish not only that he was innocent of the charge but also that there was no probable cause for the prosecution."

In *Whipple* v. *Gorsuch, supra,* we held that: "Where the facts relied upon to constitute probable cause are undisputed, the question is one of law for the court to determine and should not be submitted to the jury."

Now, applying these familiar principles to the facts of this record, however innocent Keebey may have been (and we assume that he was entirely innocent), nevertheless he was the victim of unfortunate circumstances from which, it occurs to us, all reasonable minds must conclude that Stifft believed and had grounds for entertaining "honest and strong suspicion" that Keebey was guilty of receiving stolen property knowing that same was stolen.

The facts are fully set forth and speak for themselves. In the essentials to constitute probable cause they are undisputed. The court, therefore, was correct in ruling that the issue as to this was one of law for the court and in directing the jury to return a verdict in favor of the appellee.

Affirmed.